In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 18-3416 & 18-3405

QUENTIN CRABTREE,

*Plaintiff-Appellant, Cross-Appellee,*

*v.*

EXPERIAN INFORMATION SOLUTIONS, INC.,

*Defendant-Appellee, Cross-Appellant.*

---

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-10706 — **Charles R. Norgle**, *Judge.*

---

ARGUED SEPTEMBER 4, 2019 — DECIDED JANUARY 28, 2020

---

Before ROVNER, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* We know from the Supreme Court's decision in *Spokeo, Inc. v. Robins* that a plaintiff claiming a statutory violation must allege a concrete and particularized injury for Article III standing. Recent years have shown that this principle is often easier to observe than to apply. The claim in this appeal falls on the easier side. Quentin Crabtree filed this suit against Experian for what he contends was an unauthorized release of his credit information under

the Fair Credit Reporting Act. Experian responded by going on the offensive by itself bringing a FCRA counterclaim against Crabtree. The district court dismissed Crabtree's claim because any injury was exceedingly remote and speculative. We agree. We further conclude that Experian's counterclaim likewise fails for lack of standing and therefore affirm across the board.

**I**

The Fair Credit Reporting Act or FCRA protects consumers' privacy in their credit information. It does so in part by prohibiting consumer reporting agencies like Experian from releasing credit information except under specific circumstances, which Congress enumerated in 15 U.S.C. § 1681b. One exception allows consumer reporting agencies to provide prospective lenders with a list of consumers who meet their criteria. In trade parlance, these lists are called "prescreen lists." The sharing of a prescreen list is allowed if it results in a "firm offer of credit or insurance" to every consumer on that list. See *id.* § 1681b(c)(1)(B)(i). In this way, though FCRA broadly prohibits the unauthorized disclosure of credit information, Congress authorized the limited disclosure of such information in exchange for the benefit of a guaranteed offer of credit or insurance.

Stepping back to see what the lawful exchange of prescreen lists typically looks like aids our analysis. As a consumer reporting agency, Experian compiles consumer information into credit reports and scores. Intermediate entities collect this information from Experian and provide tailored prescreen lists of consumers to creditors and insurers intending to make firm offers. So long as those creditors and insurers ultimately extend a firm offer to each person on the list, the

process complies with the privacy trade-off Congress contemplated in passing FCRA. See *id*.

At first glance that seems to be what happened when Quentin Crabtree's information appeared on a 2011 prescreen list compiled from Experian's data. But there were some complications, which Crabtree learned of in 2016 and then formed the basis of his lawsuit. The full facts are complicated and require unpacking.

Prior to the events in this case, Experian and Western Sierra had a contract that permitted Western Sierra to receive prescreen lists from Experian. These were not direct exchanges, however, as both parties used agents. Experian provided its consumer data to a company called Tranzact, which used that information to create prescreen lists. For its part, Western Sierra did not directly deal with Tranzact; rather, Tranzact sold the prescreen lists to a marketing agency called Data by IMS. Data by IMS would then extend offers backed by Western Sierra to the consumers on the prescreen list. To summarize, Experian dealt with Tranzact, Western Sierra dealt with Data by IMS, and Tranzact and Data by IMS dealt with each other—all in furtherance of Experian's contract with Western Sierra.

Though Crabtree brought his claim in 2016, the unauthorized exchange underlying his lawsuit took place in 2011. Experian terminated its contract with Western Sierra in October and set November 18, 2011 as the cutoff date. At that point, Western Sierra was no longer authorized to receive Experian's credit data, including in the form of prescreen lists prepared by Tranzact and purchased by Data by IMS.

Despite the terminated contract, a prescreen list with Experian's data made it through the web of credit-related entities to Western Sierra on November 30, 2011. Neither Experian nor Western Sierra knew there was any problem. Experian did not know that Tranzact had given a list to Data by IMS that would be backed by Western Sierra, and Western Sierra believed that Data by IMS had obtained the list from a different consumer reporting agency with whom it still had a valid contract. Because of the miscommunication, the prescreen list of consumer credit information, which included Crabtree, was shared when it should not have been.

But these facts do not necessarily show a FCRA violation. Even though Experian's contract with Western Sierra did not authorize the disclosure, there is little indication that Western Sierra, believing that everything was in order, failed to extend firm offers to everyone on the November 2011 prescreen list. What is more, Crabtree himself testified that he was unable to say that he did not receive a firm offer from Western Sierra and in fact he "probably did" but just does not recall. Crabtree went further and admitted that he would not have sought a loan in response to any offer of credit.

These facts nonetheless gave rise to a lawsuit. Crabtree filed a complaint against Experian in November 2016—nearly five years after Experian shared his credit information with Western Sierra. Discovery revealed that Crabtree learned about this post-contract disclosure through the person who is now his lawyer. The lawyer had recognized Crabtree's name while examining the list and brought it to his attention. It was only then that Crabtree was made aware of any of this and decided to bring suit in federal court under FCRA.

Crabtree alleged that he suffered two harms from his in-
clusion on the prescreen list: an invasion of privacy and emo-
tional distress. Experian reacted to being sued by lodging a
counterclaim under FCRA. According to the counterclaim,
FCRA prohibited Crabtree from receiving a prescreen list for
any purpose other than extending a firm offer of credit—not
to support a lawsuit against a consumer reporting agency.

After extensive and complete jurisdictional discovery on
whether Crabtree had alleged the requisite injury-in-fact to
satisfy Article III's case or controversy requirement, the dis-
trict court dismissed the complaint for lack of standing pur-
suant to Federal Rule of Civil Procedure 12(b)(1). It deter-
mined that Experian's alleged statutory violation, without
further allegations of harm, was insufficient to establish a con-
crete injury and that Crabtree's emotional damages were en-
tirely unsupported. The court also dismissed Experian's
counterclaim for the same reason and required Crabtree to
pay for the deposition of Experian's proffered expert. Both
sides appealed.

## II

### A

Our first question in any case is whether we have jurisdic-
tion. Article III extends the judicial power only to the resolu-
tion of cases and controversies. At the very least, this requires
a plaintiff to have suffered an injury-in-fact traceable to the
defendant and capable of being redressed through a favorable
judicial ruling. See *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–
61 (1992); see also *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*,
924 F.3d 375, 384 (7th Cir. 2019). At the pleading stage, the

plaintiff must allege facts that demonstrate each element of Article III standing.

The alleged injury must be "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical" to satisfy Article III standing. *Lujan*, 504 U.S. at 561. A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* at 560 n.1. Concreteness means that the injury must exist: it must be "real," not abstract. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).

Identifying a violation of a statutory right does not automatically equate to showing injury-in-fact for standing purposes. See *id*. at 1548. Because the injury-in-fact requirement is rooted in Article III, Congress cannot "statutorily grant[] the right to sue to a plaintiff who would not otherwise have standing." *Id.* at 1548–49. While a "bare procedural violation, divorced from any concrete injury" may be particularized because it is unique to the individual plaintiff, without more it is insufficient to confer standing. *Id*. at 1549.

These teachings come from the Supreme Court's 2016 decision in *Spokeo, Inc. v. Robins*. Like this case, *Spokeo* concerned whether a statutory violation of FCRA satisfied the injury-in-fact requirement for purposes of Article III standing. See *id*. at 1546. Thomas Robins brought a class action against Spokeo, a so-called "people search engine," for failing to comply with FCRA's requirements. *Id.* Spokeo's service allowed users to search people by name, email address, or phone number and in return provided information such as the individual's "address, phone number, marital status, approximate age, [and] occupation[.]" *Id.* Robins alleged harm based on inaccuracies in his information. The inaccuracies amounted to a FCRA violation because Spokeo willfully failed to comply with several

of the statute's requirements, including that consumer reporting agencies "follow reasonable procedures to assure maximum possible accuracy of" consumer reports. *Id.* at 1545 (citing 15 U.S.C. § 1681e(b)).

The Supreme Court remanded the case because the appellate court had not adequately considered whether the alleged procedural violations "entail[ed] a degree of risk sufficient to meet the concreteness requirement." *Id.* at 1550. While any small error in a consumer report might violate FCRA, the Court emphasized that "not all inaccuracies cause harm or present any material risk of harm" and therefore not all inaccuracies amount to an injury sufficient to confer Article III standing. *Id.* By way of example, the Court observed that "[i]t is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." *Id.*

## B

In *Spokeo*'s wake, we like other circuits have considered its application to the concrete injury requirement in several consumer protection cases. Three particular decisions stand alongside *Spokeo* itself to frame the proper analysis here.

First, in *Gubala v. Time Warner Cable, Inc.*, Time Warner retained the plaintiff's information for eight years after he cancelled his cable television subscription but had not given the information to anyone else. 846 F.3d 909, 911 (7th Cir. 2017). We were willing to assume that Time Warner's retention of the information violated the Cable Communications Policy Act, which provides that cable operators must destroy personally identifiable information under such circumstances. *Id.* at 910. But, applying the lessons of *Spokeo*, we held that the mere retention of private consumer information, absent any

dissemination, did not constitute a concrete injury for Article III standing purposes. *Id.* at 912. We did not reach the point of considering whether the distribution of this type of information would be a privacy injury or otherwise harmful. See *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 727 (7th Cir. 2016) (holding that even though printing a credit card's expiration date on a receipt violates FCRA, there was no concrete injury because the plaintiff did not suffer any actual harm or appreciable risk of identity theft).

Next came *Robertson v. Allied Solutions, LLC*, where we held that a statutory violation that led to the deprivation of an opportunity, even if futile as a practical matter, can be enough to establish a concrete injury. 902 F.3d 690, 697 (7th Cir. 2018). A prospective employer failed to provide the plaintiff with a copy of her background report before rescinding her employment offer, which is a violation of FCRA. See *id.* at 695 (explaining that § 1681b(b)(3)(A) of FCRA requires a person intending to take an adverse action on the basis of a consumer report used for employment purposes to provide the consumer with a copy of the report). This allegation sufficed to establish an injury-in-fact for pleading purposes. See *id.* at 697. The alleged injury was concrete enough because the plaintiff as a prospective employee lost the benefit of "her interest in responding" to information in her background report, even if the information was accurate and she would have been unable to convince the prospective employer to honor the original offer. *Id.*; but see *Rivera v. Allstate Ins. Co.*, 913 F.3d 603, 616–17 (7th Cir. 2018) (holding that a violation of § 1681(a)(y)(2) of FCRA, which requires employers to disclose a summary of an investigation into employee misconduct *after* an adverse action, was not a concrete injury because the disclosure performed a "mere post hoc notice function").

More recently, we considered *Spokeo*'s application in *Casillas v. Madison Avenue Associates*, 926 F.3d 329 (7th Cir. 2019). We again held that a bare statutory violation not affecting the plaintiff does not suffice to show the concrete injury required for Article III standing. See *id.* at 334. The Fair Debt Collection Practices Act required the debt collector defendants to inform consumers that they must respond to collection notices to trigger certain statutory protections. See 15 U.S.C. § 1692g(a). The debt collectors did so but failed to state that a consumer's response had to be in writing to satisfy the statute. See *Casillas,* 926 F.3d at 332. The plaintiff, however, had never contemplated responding in any manner and was therefore, as a practical matter, unaffected by the insufficient direction provided by the debt collector defendants. See *id.* at 334. We were careful to note that a plaintiff who had verbally responded and still lost statutory protections would present a different case. See *id*. On the facts before us, though, it was plain that the plaintiff never considered responding in any way to the debt collector's collection notice, and it was that pleading shortcoming that showed the absence of any injury-in-fact for Article III standing purposes. See *id.*; see also *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887 (holding there was no concrete injury from Time Warner's failure to comply with FCRA's requirement that a disclosure be in a standalone document when the plaintiff did not allege that the extraneous information caused him any confusion).

To sum up—and emphasizing that we have avoided broad holdings and instead focused on the particular facts of each case—*Robertson v. Allied Solutions* provided an example of a prospective employee adequately pleading a concrete injury from a statutory violation that had the effect of depriving her of the chance to respond to information in a background

report that FCRA entitled her to receive. *Gubala v. Time Warner*, on the other hand, showed that a complaint fell short on the injury prong by alleging only that a defendant failed to comply with its obligation under the Cable Communications Policy Act to destroy the plaintiff's personally identifiable information. And so, too, was it not enough in *Casillas v. Madison Avenue Associates* for a plaintiff, with no intention of disputing an unpaid debt, to show that the debt collector failed to comply with the FDCPA's requirement of informing a debtor that any dispute must be in writing.

C

These principles find a straightforward application on the facts before us. The disclosure that Crabtree learned of nearly five years after Experian included his name on a prescreen list is not a concrete injury. To start with the obvious, Crabtree has not plausibly alleged that Experian shared his private credit report with a lender not intending to make a firm offer. Because of the middlemen inherent in this process, Crabtree's information got to Western Sierra from Experian even though, because of their terminated contract, it should not have. By Crabtree's own admissions, however, Western Sierra likely *did* extend him a firm offer of credit after receiving his information from Experian. The contractually unauthorized exchange of information, then, is the type of "bare procedural violation" contemplated in *Spokeo* that, without more, does not suffice to establish a concrete injury-in-fact for Article III purposes. 136 S. Ct. at 1550.

To put the same point in statutory terms, the privacy interest in credit information embodied in FCRA was permissibly exchanged for the promise of a firm offer—all of which Congress allowed in § 1681b. As Crabtree likely received the

exchanged-for benefit—a point he admitted in his deposition testimony—any potential injury based on the possibility that he did not receive a firm offer is too speculative and remote to satisfy Article III's injury-in-fact requirement.

Even more, Crabtree has identified no harm of any kind. Like the plaintiff in *Casillas* who never attempted to respond to the debt collector and therefore was not affected by the incomplete instructions, Crabtree admitted in sworn testimony that he would have thrown any firm offer from Western Sierra in the trash. Indeed, he only learned about these events after being contacted by his lawyer nearly five years later. If this communication had not occurred, Crabtree would have gone on completely unaware of and unaffected by any prescreen list. This all falls well short of the concreteness mandated by Article III. Crabtree had to come forward with something showing that he did not receive a firm offer, that Western Sierra would not have honored a firm offer, that he was affected by the lack of a firm offer, or that he suffered any actual emotional damages. He failed on each possible ground, leaving him without the concrete injury necessary for Article III standing.

D

Do not overread our conclusion to mean that a claim like Crabtree's fails as a matter of course. Based on *Spokeo*'s principles, there is no question that a consumer reporting agency's unauthorized disclosure of consumer credit information can be a concrete injury. The common law recognized some right to privacy that "encompass[es] the individual's control of information concerning his or her person." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989). And FCRA specifically articulates a statutory right to privacy

in consumer credit reports. See 15 U.S.C. § 1681(a). We have previously recognized this right to privacy in such information. See *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 728 (7th Cir. 2004) (holding that a plaintiff stated a claim when a lender obtained her credit data without giving her the benefit of a firm offer, one of the permissible purposes under FCRA).

The disclosure of consumer credit information, absent any exchanged-for consumer benefit contemplated by FCRA, can constitute an injury-in-fact for the purpose of Article III standing. The common law history, Congress's judgment in FCRA, and our line of cases all support the conclusion that the injury can be sufficiently real. The plaintiff just needs to plead or otherwise come forward with some evidence showing that is what happened and thus is the source of the alleged injury giving rise to the FCRA claim. The district court was right to conclude that Crabtree failed to meet these standards.

### III

### A

This brings us to Experian's counterclaim. Recall that Experian, in response to being sued under FCRA, affirmatively invoked the statute to bring a counterclaim against Crabtree. It alleged that Crabtree as the plaintiff violated § 1681n(b) by himself obtaining a prescreen list to initiate this lawsuit, a purpose Experian sees as well outside those enumerated in the statute. The district court dismissed the counterclaim on the basis that Experian lacked standing. More to it, the district court found Experian's allegation of reputational harm speculative, while also concluding that the Supreme Court's decision in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), precluded the company from pointing to the costs it

incurred in defending Crabtree's lawsuit as an injury for Article III standing.

We chart a different path of reasoning in reaching the same conclusion and start with Experian's allegation of reputational harm. We agree with the district court that this was not a sufficient injury, as it was unsupported by any factual allegations. Experian's counterclaim points to no definite reasons to believe Crabtree's lawsuit tarnished the company's goodwill, affected its future business prospects, or lessened its position as one of the nation's major consumer reporting agencies. It is not enough to say that your reputation was harmed without explaining how. See *Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 669 (7th Cir. 2015) (holding that "a political figure's assertion, without more, that the receipt . . . [of] a benefit will hurt his or her reputation . . . is insufficient to establish standing"). Experian's bare counterclaim allegations are "conjectural or hypothetical" and therefore are insufficient to confer standing. *Lujan*, 504 U.S. at 560; see also *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016) ("Legal conclusions or bare and conclusory allegations . . . are insufficient to state a claim.").

B

As for Experian's second basis for standing, we see the analysis in terms different than those endorsed by the district court. The costs to defend a lawsuit can be an injury-in-fact for purposes of Article III. In the case relied on by the district court, *Steel Co. v. Citizens for a Better Environment*, the Supreme Court only addressed whether a plaintiff can satisfy standing simply by pointing to the cost of bringing suit. See 523 U.S. at 107. While that cost may be concrete and particularized, the Court held that "[t]he litigation must give the plaintiff some

other benefit besides reimbursement of costs that are a by-
product of the litigation itself." *Id*. A contrary rule would es-
sentially eliminate the injury and redressability requirements
of Article III standing. Here, however, Experian alleged that
the harm is the cost of *defending* the lawsuit, not bringing it.
So we cannot conclude that *Steel Company* resolves the ques-
tion.

Experian's position—that the cost of defending a lawsuit
is enough for Article III standing—finds some support in our
court's *Steel Company* decision, which we decided on a re-
mand from the Supreme Court. See *Citizens for a Better Env't
v. Steel Co.*, 230 F.3d 923, 926 (7th Cir. 2000). Even though the
Supreme Court dismissed the underlying case for lack of ju-
risdiction, we retained authority on remand to award attor-
ney's fees to the prevailing party that was "injured in fact to
the tune of $270,000 and counting." *Id.* We explained that the
law allows "awards of litigation expenses in suits that federal
courts are not authorized to decide on the merits." *Id.* at 927.
Against this principle, it is hard to say that litigation expenses
alone cannot be a concrete and particularized injury for the
purpose of our Article III standing.

To recognize that Experian has Article III standing to bring
a counterclaim does not mean the company has a statutory
right under FCRA to recover its defense costs, however. And
even if such a right exists, the proper mechanism for relief
from this type of injury ordinarily is not a counterclaim but
instead a motion made after the court has entered judgment.
Even more specifically, Federal Rule of Civil Procedure 54
provides that a claim for attorney's fees "must be made by
motion unless the substantive law requires those fees to be
proved at trial as an element of damages." FED. R. CIV. P.

54(d)(2)(A). This motion must specify "the statute, rule, or other grounds entitling the movant to the award." FED. R. CIV. P. 54(d)(2)(B)(ii).

In *Citizens for a Better Environment*, we held that the defendants had Article III standing to avail themselves of a federal statutory right to recover their defense costs after the Supreme Court dismissed the plaintiff's Emergency Planning and Community Right-to-Know Act claim. See 230 F.3d at 926. That does not mean, however, that this Article III standing alone was sufficient to bring their lawsuit; it was essential to the decision that the relevant statute provided for the recovery of attorney's fees. See *id*. at 925 (citing EPCRA's cause of action for litigation costs in 42 U.S.C. § 11046(f)). To recover costs, there must be a federal statutory right or some other grounds for a defendant to avail on its claim.

Put more simply, a party injured only by incurring defense costs—while injured for constitutional purposes—must find some statutory or common law hook for its motion or claim to recover those costs. Determining whether there is a cause of action in these circumstances "is a matter of statutory meaning, not of the power to adjudicate." *Id*. at 928; see also *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017) (noting that the Supreme Court has cautioned against using "prudential standing" to describe the statutory interpretation exercise of discerning a cause of action's scope under a particular statute). The most obvious basis is a statutory right for defense costs, but defendants could also point to a common law claim for malicious prosecution. See, *e.g.*, *City of New Haven v. Reichhart*, 748 N.E.2d 374, 378 (Ind. 2001) (listing the elements for a malicious prosecution claim under Indiana law). Absent either of these more straightforward grounds, a

defendant whose only injury is defense costs may attempt to shoehorn itself into another cause of action. That is what is happening here.

C

FCRA does not provide a statutory cause of action to recover defense costs. If it did, this issue would be easy. All we would need to do is determine whether Experian satisfied the statutory criteria for recovery.

Recognizing this, Experian has nonetheless invoked FCRA and tries to fit under a different provision of the statute to bring its counterclaim. To do so, though, the law requires Experian to show that its claim "fall[s] within the zone of interests protected" by the precise provision of FCRA invoked in its counterclaim. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). The controlling question is "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127. To do so we "apply traditional principles of statutory interpretation." *Id.* at 128.

*Lexmark* itself illustrates the proper approach. The case concerned whether Static Control, a maker and seller of components for Lexmark's cartridges, had standing to sue Lexmark for false advertising under the Lanham Act. See *id.* at 120. Static Control invoked § 1125(a) of the statute and alleged that Lexmark misled consumers to believe that they were required to return ink cartridges after a single use, as opposed to using Static Control's parts to refurbish the cartridges. See *id.* at 122–23. Static Control also alleged that Lexmark falsely advertised to companies in the toner cartridge manufacturing business by sending letters stating that

it was illegal to sell Lexmark cartridges that had been refurbished with Static Control's parts. See *id.* This injured Static Control by diverting its sales to Lexmark. See *id.* at 123.

In order to bring a claim, the Court emphasized that Static Control must fall within the zone of interests protected by § 1125(a) of the Lanham Act for false advertising, which authorizes suit by "any person who believes that he or she is likely to be damaged by a defendant's false advertising." *Id.* at 129 (internal quotations omitted) (citing 15 U.S.C. § 1125(a)). The Court then looked to the Lanham Act's express goals of preventing fraud and protecting persons engaged in commerce against unfair competition. See *id.* at 131. From there the Court concluded that a plaintiff bringing a claim under this provision "must allege an injury to a commercial interest in reputation or sales." *Id.* at 131–32. For example, "[a] consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but . . . cannot invoke the protection of the Lanham Act." *Id.* at 132. Because the plaintiff in *Lexmark* was a business engaged in commerce whose position had been damaged by false advertising, not a "deceived consumer," there was "no doubt" they fell within the statute's zone of protected interests. *Id.* at 137.

D

Determining whether Experian can bring its counterclaim requires us to follow *Lexmark*'s guidance by asking both whether the company has Article III standing and, separately, whether it falls within the zone of interests Congress meant to protect in creating a civil cause of action in § 1681b. The first question is straightforward. Experian, in defending Crabtree's claims, has suffered a redressable injury-in-fact that is

traceable to Crabtree. If Crabtree had not committed the alleged statutory violation by obtaining the prescreen list, he would not have known that Experian disclosed his information to Western Sierra after the termination of their contract. So, the reasoning continues, there would have then been no lawsuit and Experian would have saved the time, money, and energy it spent defending against Crabtree's claim.

But we know from *Lexmark* that identifying an injury is not the same as locating a viable statutory cause of action. Experian cannot bring its counterclaim because the FCRA cause of action that it invokes does not encompass that claim. Experian brought its counterclaim under FCRA's provision for civil liability for knowing noncompliance, which covers "[a]ny person who obtains a consumer report from a consumer reporting agency under false pretenses or knowingly without a permissible purpose[.]" 15 U.S.C. § 1681n(b). On the surface, § 1681n(b) might seem to cover Crabtree's actions because he obtained the prescreen list through his lawyer for the purpose of bringing this lawsuit, which is not a permissible purpose.

But it is not enough to fit literally into the statutorily created cause of action. See *Lexmark,* 572 U.S. at 129. The zone-of-interests test requires us to look at FCRA's purpose to determine Congress's intended scope. See *id.* at 131. Congress described that purpose as "requir[ing] that consumer reporting agencies adopt reasonable procedures . . . in a manner which is fair and equitable to the consumer . . . ." 15 U.S.C. § 1681(b). It also explained that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *Id*. § 1681(a)(4).

These statutory provisions make clear that Congress passed FCRA to protect consumers' right to privacy in their credit data. The statutory objective was to confer protections on consumers, not to arm consumer reporting agencies with rights *against* consumers. It follows, then, that Congress intended to authorize consumers—not consumer reporting agencies like Experian—to sue for violations of the Act. There is no shortage of litigation under FCRA, yet Experian does not point to a single example of FCRA being used offensively by a consumer reporting agency against an individual consumer in the manner pursued here—to recover defense costs. Nor did our research uncover any such case. Adhering to the teachings of *Lexmark*, we cannot conclude that Experian fits within the zone of interests protected by FCRA and it therefore does not have a cause of action under § 1681n(b).

## IV

We close by considering Crabtree's challenge to the district court's order requiring him to pay for the deposition of Experian's expert. He sees the order as an abuse of discretion because the court did not first perform its gatekeeping role of determining that the expert's proffered testimony would be admissible at trial under the standards embodied in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

We find no abuse of discretion in this award. See *Schrott v. Bristol–Myers Squibb Co.*, 403 F.3d 940, 943 (7th Cir. 2005). Federal Rule of Civil Procedure 26(b)(4)(E) requires "the party seeking discovery" to pay the expert a reasonable fee "[u]nless manifest injustice would result." *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 851 (7th Cir. 2012). Manifest injustice is a high standard that is satisfied only in extraordinary

circumstances. See *Se-Kure Controls, Inc. v. Vanguard Products Group*, 873 F. Supp. 2d 939, 957 (N.D. Ill. 2012) (collecting examples of manifest injustice such as where a party made misrepresentations of its expert's opinions). Nothing in the record suggests that "manifest injustice" resulted from requiring Crabtree to pay the expert fee. The expert's fee, which the district court reduced, was also reasonable.

Crabtree also misses the mark in contending that the district court had to rule on his *Daubert* motion to exclude Experian's expert testimony before considering Experian's application for costs under Rule 26(b)(4)(E). Not so. The Rule applies to any "expert whose opinions *may* be presented at trial." FED. R. CIV. P. 26(b)(4)(A) (emphasis added). The clear import of Rule 26 is that the district court generally must order a party to pay for the cost of deposing its adversary's expert regardless of whether the expert's opinion ultimately is presented at trial. Had the claim gone to trial, Experian's expert may have testified and the award of fees was therefore appropriate.

For these reasons, we AFFIRM.