# Illinois Official Reports

## Appellate Court

---

### *Rivera v. Allstate Insurance Co.*, 2021 IL App (1st) 200735

---

| | |
|---|---|
| Appellate Court Caption | DANIEL RIVERA; STEPHEN KENSINGER; DEBRA JOY MEACOCK; and REBECCA SCHEUNEMAN, Plaintiffs-Appellants, v. ALLSTATE INSURANCE COMPANY, Defendant-Appellee. |
| District & No. | First District, First Division<br>No. 1-20-0735 |
| Filed<br>Rehearing denied | June 14, 2021<br>July 8, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 19-L-3757; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Robert D. Sweeney, John J. Scharkey, Joanne H. Sweeney, and Anna R. Bugan, of Sweeney, Scharkey & Blanchard, LLC, of Chicago, for appellants.<br><br>Gerard Pauling, Uma Chandrasekaran, and Katelyn Miller, of Seyfarth Shaw LLP, and Anneliese Wermuth and Jenny R. Goltz, of Cozen & O'Connor, both of Chicago, and Rex Heinke and Jessica M. Weisel, of California Appellate Law Group, of Los Angeles, California, for appellee. |

JUSTICE PIERCE delivered the judgment of the court, with opinion.
            Justices Hyman and Coghlan concurred in the judgment and opinion.


**OPINION**

¶ 1        This is an appeal from the dismissal of defamation *per se*, defamation *per quod*, and false light claims. Plaintiffs—Daniel Rivera, Stephen Kensinger, Debra Joy Meacock, and Rebecca Scheuneman—originally filed a complaint in federal court, asserting a federal claim along with state-law defamation claims against defendant, Allstate Insurance Company (Allstate). Plaintiffs' federal claim and defamation *per quod* claim were tried before a federal jury, which found in favor of plaintiffs. That verdict—along with a $27 million judgment in plaintiffs' favor—was vacated on appeal to the Seventh Circuit Court of Appeals because plaintiffs lacked standing to bring their sole federal claim, which in turn destroyed any federal subject-matter jurisdiction over plaintiffs' state law claims. Plaintiffs refiled their defamation *per quod* claim, along with defamation *per se* and false light claims, in the circuit court of Cook County. The circuit court dismissed plaintiffs' claims with prejudice, finding that plaintiffs' defamation *per quod* and false light claims were barred by collateral estoppel and that plaintiffs failed to state a claim for defamation *per se*. Plaintiffs appeal. For the reasons that follow, we affirm the circuit court's judgment.

¶ 2                              I. BACKGROUND
¶ 3        For the purposes of this appeal, we accept as true the factual allegations in plaintiffs' complaint. The following is a summary of those allegations.

¶ 4        Between 2006 and 2007, plaintiffs began working with the growth team in Allstate's Equity Division. The growth team was responsible for researching and investing Allstate's money in growth stocks. Rivera became the head of the Equity Division in 2007, and he reported to Allstate's chief investment officer, Judith Greffin. Meacock, Kensinger, and Scheuneman were members of the growth team. Early in 2009, an Allstate employee contacted the compliance officer in Allstate's Investment Department to report suspected improper trading practices. The employee suspected that portfolio managers in the Equity Division were timing equity trades to manipulate the company's portfolio performance measurement system—which the plaintiffs dub the "Dietz Method"—to maximize individual bonuses to the detriment of their portfolios.

¶ 5        The Dietz Method, which Allstate adopted in the 1990s, calculates a portfolio's performance based on certain assumptions regarding when cash flows occur rather than when the cash flows actually occur. Because of those assumptions, the Dietz Method can result in distortion or error, known as the "Dietz Effect," which becomes more pronounced in portfolios with large in- and out-flows of cash coupled with high volatility in individual securities and the overall securities market. When Allstate's trading desk sold stock on a day when the overall equities market was down or purchased stock on days when the market was up, the portfolio— and by extension, the portfolio's manager—could see an artificially lowered performance, known as a "negative Dietz." The inverse was also true: selling stock on a day when the market was up at the close or buying stock on a day when the market was down could result in an artificial inflation of the portfolio and the portfolio manager's performance, known as a

"positive Dietz." Under Allstate's "Pay for Performance Plan," eligible employees—which included plaintiffs—would receive merit bonuses if their portfolios or managed funds achieved a certain rate of return calculated under the Dietz Method. In other words, portfolio managers could improve their individual bonus by timing trades to achieve a positive Dietz, even if the net effect of the trades on the portfolio was negative.

¶ 6    Allstate hired the law firm Steptoe & Johnson LLP to conduct an internal investigation into the allegations of timed trades. Steptoe & Johnson retained an IT consultant to review internal e-mails in the Investment Department and retained an economic consulting firm to review trades executed in the Equity Division between 2003 and 2008. The law firm also interviewed employees, including plaintiffs, regarding their understanding of the Dietz Method, their trading practices, and Allstate's method for calculating bonuses.

¶ 7    On October 6, 2009, Greffin informed Rivera that Allstate was shutting down the Equity Division, outsourcing the division's responsibilities, and terminating all the division's employees. Rivera was not permitted to attend the meeting where Greffin informed the division's employees of the changes, and he was instead escorted out the building by a human resources representative. Allstate instructed Equity Division employees to attend exit interviews conducted by lawyers for Allstate, Steptoe & Johnson, and other outside law firms at locations away from Allstate's campus. Employees of the Equity Division were told that they could use their company phones and e-mail accounts to secure new employment, and they could take advantage of Allstate's offboarding and job placement resources through the end of December 2009. Around October 7, 2009, Rivera returned to Allstate's campus to retrieve his personal belongings and spoke briefly with Kensinger and Meacock. Subsequently, Rivera, Kensinger, and Meacock were informed that they were being terminated for cause for violating Allstate's code of ethics. Unlike their coworkers, they would not be paid any severance and would not be permitted to use Allstate's offboarding or job placement services. Their phones and e-mail accounts were immediately taken offline.

¶ 8    On February 25, 2010, Allstate filed its annual Form 10-K with the Securities and Exchange Commission, disclosing that it conducted an internal investigation into alleged trading improprieties and that it had paid $91 million into its pension plans to cover any potential adverse impact. The Form 10-K stated, in relevant part:

"In 2009, we became aware of allegations that some employees responsible for trading equity securities in certain portfolios of two [Allstate] defined benefit pension plans and certain portfolios of [Allstate] and an [Allstate] subsidiary may have timed the execution of certain trades in order to enhance their individual performance under incentive compensation plans, without regard to whether such timing adversely impacted the actual investment performance of the portfolios.

We retained outside counsel, who in turn engaged an independent economic consulting firm to conduct a review and assist us in understanding the facts surrounding, and the potential implications of, the alleged timing of these trades for the period from June 2003 to May 2009. The consulting firm reported that it was unable to determine from our records the precise amounts by which portfolio performance might have been adversely impacted during that period. Accordingly, the economic consultant applied economic modeling techniques and assumptions reasonably designed to estimate the potential adverse impact on the pension plans and the company

- 3 -

accounts, taking into account, among other things, the distinctions between the pension plans and the company portfolios.

Based on their work, the economic consultants estimated that the performance of the pension plans' portfolios could have been adversely impacted by approximately $91 million (including interest) and that the performance of the company portfolios could have been adversely impacted by approximately $116 million (including interest) in the aggregate over the six-year period under review. We believe that our financial statements and those for the pension plans properly reflected the portfolios' actual investment performance results during the entire period that was reviewed.

In December 2009, based on the economic consultant's modeled estimates, we paid an aggregate of $91 million into the two defined benefit pension plans. These payments had no material impact on our reported earnings or shareholders' equity, but reduced our assets, operating cash flows, and unfunded pension liability to the plans. *** At all times during this period, the plans were adequately funded pursuant to applicable regulatory and actuarial requirements. As a result of these additional funds in the plans, our future contributions to the plans, based on actuarial analysis, may be reduced. Using the economic consultant's calculation of the potential adverse impact on the portfolios, we currently estimate that the additional compensation paid to all the employees working in the affected group was approximately $1.2 million over the six-year period as a result of these activities. In late 2009, we retained an independent investment firm to conduct portfolio management and trading activity for the specific portfolios impacted by these activities."

¶ 9     Also on February 25, 2010, Greffin sent a memo to Investment Department employees (Greffin memo). The Greffin memo stated:

"Allstate released its annual financial report on Form 10-K today. Within that filing, we disclosed details around allegations regarding trading practices within our equity portfolios that came to light in the past year. We took this matter very seriously and launched an investigation as soon as we became aware of the allegations.

Outside counsel was retained to assist us in understanding the facts surrounding, and the potential implications of, these activities. As part of their analysis, an independent economic consulting firm was retained to estimate the potential adverse impact to the performance of our portfolios. The consultant determined that the performance on some of our portfolios, as well as our two pension plan portfolios, could have been adversely impacted by the activities.

As a result, Allstate made a contribution to the pension plans during the 4th quarter which is disclosed in the 10-K.

We believe that our financial statements and those of the pension plans properly reflected the portfolios' actual investment performance and the pension plans were adequately funded during this entire period. This matter did not affect the plans' ability to continue to provide benefits to plan participants.

Situations like this can be unsettling and can reflect poorly on our organization. However, I believe organizations are also defined by how they respond to events like this. We were transparent in reporting this matter to the U.S. Department of Labor and

the S.E.C., and disclosed it to our investors. We're taking steps to improve our governance, compliance practices and training.

We remain committed to the highest levels of ethics and integrity in the stewardship of Allstate's assets."

¶ 10 Plaintiffs further alleged that Allstate's communications with the Securities and Exchange Commission and the Department of Labor "significantly undercut, if not outright refuted, the statements made by Greffin and the [Form] 10-K." Steptoe & Johnson sent a memo to the Department of Labor that outlined the methodology of its investigation and acknowledged that the estimated potential economic damage of $91 million to Allstate's pension plans "overstate[d] any actual economic disadvantage suffered by the plans" and identified several reasons why. According to plaintiffs, Allstate's analyses showed that any Dietz-motivated trading would have had a positive effect of $37 million on the pension plans. The assumptions used in the investigation's analyses were "unsupportable, if not outlandish." Furthermore, Allstate never made public that the $1.2 million in allegedly ill-gotten bonuses were distributed among 25 employees and the effect on the bonuses could have—based on the assumptions made in the economic impact analysis—been $0. Allstate limited its investigation to the Equity Division without looking at other divisions responsible for investing substantially more money, even though there was evidence that managers in other divisions explicitly directed their teams to time trades.

¶ 11 A. Federal Litigation

¶ 12 Plaintiffs filed a complaint in federal district court and, relevant here, asserted defamation *per se* and defamation *per quod* claims based on Allstate's statements in the Form 10-K and Greffin memo, and contended that Allstate violated section 1681a(y)(2) of Title 15 of the United States Code, commonly referred to as the Fair Credit Reporting Act (FCRA) (15 U.S.C. § 1681a(y)(2) (2012)) by failing to provide them with a summary of Steptoe & Johnson's findings after plaintiffs were fired. The parties engaged in lengthy discovery. The district court entered summary judgment in favor of Allstate on plaintiffs' defamation *per se* claim, and the case proceeded to a jury trial on plaintiffs' defamation *per quod* and FCRA claims. The jury returned a verdict in favor of plaintiffs and, all told, awarded plaintiffs $17 million in compensatory damages on the defamation claim, $10 million in punitive damages on the defamation claim, and $4000 in statutory damages for violating FCRA. The district court tacked on an additional $12,000 in punitive damages for the FCRA violation and awarded plaintiffs' counsel over $350,000 in statutory attorney fees.

¶ 13 Allstate appealed. The Seventh Circuit Court of Appeals addressed the merits of plaintiffs' defamation *per quod* claim and found that plaintiffs had failed to present any evidence of special damages. The Seventh Circuit vacated the jury's verdict and damages awards on the defamation *per quod* claim and remanded to the district court with instructions to enter judgment in favor of Allstate. *Rivera v. Allstate Insurance Co.*, 907 F.3d 1031, 1039-41 (7th Cir. 2018) (*Rivera I*). Furthermore, the court of appeals found that plaintiffs lacked standing to pursue their FCRA claim under *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S. Ct. 1540 (2016), because plaintiffs only alleged a mere procedural injury that did not result in a concrete injury-in-fact. The court of appeals vacated the jury's verdict and damages awards related to the FCRA claim and remanded with instructions for the district court to dismiss the FCRA claim. *Rivera I*, 907 F.3d at 1041-46.

¶ 14    Plaintiffs sought rehearing, arguing that the district court had no supplemental jurisdiction to adjudicate their state law defamation claim if plaintiffs lacked standing to pursue their FCRA claim—their only federal claim—in the district court. The court of appeals withdrew its opinion in *Rivera I* and issued a modified opinion on denial of rehearing. *Rivera v. Allstate Insurance Co.*, 913 F.3d 603 (7th Cir. 2018) (*Rivera II*). The court of appeals first addressed plaintiffs' FCRA claim. A full examination of the statutory provision at issue is available in the Seventh Circuit's opinion, but for our purposes, the court observed:

> "The FCRA claim in this case rests on the premise that Allstate was required under subsection (y)(2) to provide a summary of Steptoe's investigation after firing the plaintiffs but failed to do so. It's not at all clear, though, that the Steptoe investigation would otherwise qualify as a 'consumer report' but for the subsection (d)(2)(D) exclusion. And if the Steptoe investigation isn't a 'consumer report' in the first place, then subsection (y)(2) does not come into play and the FCRA simply does not apply." *Id.* at 614.

The court of appeals noted that Steptoe & Johnson's investigation would qualify as a "consumer report" only if Steptoe & Johnson was a consumer reporting agency, and the record was devoid of evidence that Steptoe & Johnson satisfied the statutory definition of a consumer reporting agency, "probably because Allstate never disputed these points, choosing instead to contest the FCRA claim on other grounds." *Id.* at 614-15. Turning to the issue of standing, the court of appeals examined its own FCRA case law discussing the difference between a "notice claim," which is based solely on the failure of a party to give a required notice, and "adverse-action claim," which is some employer action taken in connection with a procedural violation. *Id.* at 616. The Seventh Circuit found that plaintiffs' FCRA claim was akin to a notice claim and, even if a notice were required, a post-decision, brief oral summary of the investigation would suffice. *Id.* at 617. Plaintiffs did not allege an actual injury to support their FCRA claim; Allstate's alleged failure to provide a summary of Steptoe & Johnson's post-investigation findings was a "mere procedural violation unaccompanied by any concrete injury." *Id.* The court of appeals completed its standing analysis by stating:

> "The plaintiffs insist that Allstate's failure to comply with subsection (y)(2) left them 'hampered in defending themselves before Allstate or potential employers.' But subsection (y)(2) doesn't protect a substantive 'defense' interest. At most it serves a minimal notice function. And the plaintiffs have not explained how the modest, post hoc summary required by subsection (y)—again, a brief oral summary suffices—could possibly have informed a 'defense' against Allstate after the fact. We note, moreover, that they failed to identify any prospective employer that refused to hire them based on the 10-K or the Greffin memo, so they have not established that they suffered a concrete informational injury. Nor have they identified any other tangible or intangible harm arising from Allstate's failure to comply." *Id.*

¶ 15    Since plaintiffs lacked standing to pursue their FCRA claim, the district court was instructed to dismiss the FCRA claim for lack of standing. *Id.* With no original federal jurisdiction over any other claim, the district court could not exercise supplemental jurisdiction over plaintiffs' defamation claim. *Id.* at 617-18. The court of appeals vacated the jury's verdict and the damages awards and instructed the district court to dismiss the entire action, including

the defamation claim, for lack of federal subject-matter jurisdiction. *Id.* at 618.[1]

¶ 16                                    B. The Proceedings Below

¶ 17        Plaintiffs then filed the three-count complaint at issue in this appeal. The allegations in each count are substantially similar. Count I alleged that the statements in Allstate's Form 10-K and in Greffin's memo (1) falsely accused plaintiffs of improperly timing trades to increase their individual bonuses, (2) falsely claimed that Allstate's pension plans suffered $207 million damages because of plaintiffs' trades, and (3) falsely stated that Allstate estimated the unearned bonuses paid to employees of the Equity Division were $1.2 million. Plaintiffs alleged that Allstate's statements (1) "impute the commission of a criminal offense to [p]laintiffs," (2) "impute an inability to perform or want of integrity in the discharge of the duties of [p]laintiffs' employment," and (3) "prejudice [p]laintiffs, or impute a lack of ability, in their trade, profession, and business." Furthermore, plaintiffs alleged that Allstate's statements "have caused [p]laintiffs damages in their business and profession and made it impossible for them to achieve comparable employment in a highly competitive field" and Allstate's "statements and actions *** surrounding the investigation, termination and outsourcing of the 'effected portfolios' sufficiently describe Plaintiffs as the parties accused of wrongdoing by Allstate to those in their community."

¶ 18        Count II asserted a claim for defamation *per quod*, and count III asserted a claim for false light. The allegations in count II are identical to the allegations in count I in all material respects, with only minor changes (which appear to be inadvertent). The same goes for the false light claim in count III, which further alleged that Allstate's statements were "highly offensive or embarrassing to a reasonable person of ordinary sensibilities in [p]laintiffs' community" and that Allstate made the statements "with reckless disregard as to their offensiveness and in fact have refuted the statements in [Allstate's] communications with the U[nited] S[tates] government."

¶ 19        Allstate filed a combined motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2018)). Allstate argued that counts II and III should be dismissed pursuant to section 2-619 of the Code (*id.* § 2-619) based on collateral estoppel because the issue of whether plaintiffs suffered any special damages to support a defamation *per quod* claim had been rejected by the court of appeals as part of its standing analysis. Allstate pounced on the Seventh Circuit's statement that "We note, moreover, that [plaintiffs] *failed to identify any prospective employer that refused to hire them based on the 10-K or the Greffin memo*, so they have not established that they suffered a concrete informational injury." (Emphasis added.) See *Rivera II*, 913 F.3d at 617.

¶ 20        Allstate also moved to dismiss all of plaintiffs' claims under section 2-615 of the Code (735 ILCS 5/2-615 (West 2018)). Allstate asserted that the defamation *per se* claim in count I should be dismissed because neither the Form 10-K nor the Greffin memo mentioned plaintiffs by name and at most referred to a group of people to which plaintiffs belonged, the statements contained in those documents were of a general nature, and the statements were capable of an

---

[1]Allstate filed a petition for a writ of *certiorari* in the United States Supreme Court, seeking review of whether a federal court may exercise supplemental jurisdiction over state-law claims when it determines after trial that a plaintiff lacks standing to pursue its federal claims. The Supreme Court denied Allstate's petition. *Allstate Insurance Co. v. Rivera*, ___ U.S. ___, 140 S. Ct. 555 (2019).

innocent construction. Allstate argued that the defamation *per quod* claim in count II should be dismissed because plaintiffs did not and could not "identif[y] any specific third party or employer who was aware of the alleged defamatory statements, let alone refused to hire them because of the alleged defamation." Allstate pointed out that the parties had engaged in five years of discovery in the federal litigation, and "[i]f supporting facts existed, [p]laintiffs would have discovered them by now and included them in the instant [c]omplaint." Finally, Allstate argued that plaintiffs' false light claim in count III failed because nothing in the allegedly defamatory statements specifically identified plaintiffs.

¶ 21    After briefing, the circuit court entered a written order dismissing count I pursuant to section 2-615 and dismissing counts II and III pursuant to section 2-619. With respect to count I, the circuit court found that the allegedly defamatory statements did not name the plaintiffs in any manner and, therefore, plaintiffs could not plead a claim for defamation *per se*. With respect to counts II and III, the circuit court found that collateral estoppel barred plaintiffs from pursuing their defamation *per quod* and false light claims because the Seventh Circuit found that plaintiffs had not established a hampered defense or any other type of injury and plaintiffs needed to establish special damages to plead defamation *per quod* and false light claims. The circuit court's order reflects that its dismissal of all the claims was with prejudice.

¶ 22    Plaintiffs filed a timely notice of appeal.

## II. ANALYSIS

¶ 24    On appeal, plaintiffs seek reversal of the circuit court's judgment with respect to each count of their complaint. They contend that count I of their complaint stated a claim for defamation *per se*. They also contend that counts II and III should not have been dismissed on collateral estoppel grounds because the federal court of appeals did not decide any aspect of plaintiffs' defamation claim.

¶ 25    The circuit court dismissed count I pursuant to section 2-615 of the Code and dismissed counts II and III pursuant to section 2-619. Our review of the circuit court's judgment involves familiar principles. A section 2-615 motion tests the legal sufficiency of a claim. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). When reviewing a section 2-615 motion, we must determine whether the allegations in the complaint, viewed in the light most favorable to plaintiff, sufficiently state a cause of action. *Id.* We accept the well-pleaded factual allegations as true, and a section 2-615 dismissal is only appropriate where it is clear "that no set of facts can be proved that would entitle the plaintiff to recovery." *Id.* (citing *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006)). A section 2-619 motion admits the legal sufficiency of a claim but interposes some affirmative matter or defect that defeats the plaintiff's claim. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006). Our review of a dismissal under either section is *de novo*. *Id.* We also note that, in the circuit court, Allstate alternatively sought dismissal of counts II and III pursuant to section 2-615. While the circuit court did not rely on section 2-615 to dismiss those claims, we may affirm the circuit court's judgment on any basis supported by the record, regardless of the circuit court's specific reasoning. *Chang Hyun Moon v. Kang Jun Liu*, 2015 IL App (1st) 143606, ¶ 11.

¶ 26    To state a claim for defamation, the plaintiff must allege that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and plaintiff was damaged. *Solaia*, 221 Ill. 2d at 579. Allegedly defamatory statements are actionable either *per se* or *per quod*. A statement is defamatory *per se* if "the

statements that form the basis of the action *** falsely charge the plaintiff with misconduct or incapacity in words so obviously and naturally harmful that they are actionable without proof of special damages." *Costello v. Capital Cities Communications, Inc.*, 125 Ill. 2d 402, 414 (1988). Our supreme court recognizes five types of statements that are defamatory *per se*:

> "(1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication." *Green*, 234 Ill. 2d at 491-92.

When a statement falls within one of these categories, a plaintiff does not need to allege or prove actual damages to the plaintiff's reputation because the "actionable *per se* categories are thought to be so obviously and materially harmful to the plaintiff that injury to [the plaintiff's] reputation may be presumed." *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996).

¶ 27    When an allegedly defamatory statement does not fall within a recognized defamatory *per se* category, a plaintiff may pursue a claim for defamation *per quod* by pleading facts to show that extrinsic circumstances demonstrate an injurious meaning behind the statement. *Id.* at 87-88. "If a defamatory statement does not fall within one of the limited categories of statements that are actionable *per se*, the plaintiff must plead and prove that she sustained actual damage of a pecuniary nature ('special damages') to recover." *Id.*

¶ 28    Finally, to state a claim for false light, the plaintiff must allege "(1) he was placed in a false light before the public as a result of the defendant's actions; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice." *Chang Hyun Moon*, 2015 IL App (1st) 143606, ¶ 17 (citing *Kurczaba v. Pollock*, 318 Ill. App. 3d 686, 696 (2000)). "Additionally, if a false light invasion of privacy claim is based on statements that are not defamatory *per se*, a plaintiff must allege that he suffered special damages." *Id.* (citing *Schaffer v. Zekman*, 196 Ill. App. 3d 727, 736 (1990)).

¶ 29                      A. Plaintiffs' Defamation *Per Se* Claim

¶ 30    We first address plaintiffs' argument that the circuit court erred by dismissing their defamation *per se* claim in count I of their complaint. The circuit court found that the allegedly defamatory statements in the Form 10-K and the Greffin memo did not name any plaintiffs in any manner, and therefore plaintiffs could not plead a claim for defamation *per se*. On appeal, plaintiffs argue that statements may be defamatory *per se* even if they do not specifically name plaintiffs. We find no error in the circuit court's judgment dismissing count I.

¶ 31    At the outset, we note that Allstate does not dispute that the statements in the Form 10-K and Greffin memo fall within the recognized categories of statements that are actionable *per se*. Instead, Allstate makes two related arguments as to why plaintiffs failed to and cannot state a defamation *per se* claim. First, Allstate argues that the statements themselves do not identify any plaintiff by name, and therefore the statements on their face are not injurious to any plaintiff. Second, Allstate contends the statements are capable of an innocent construction because the allegedly defamatory statements, made months after plaintiffs were fired from Allstate, could reasonably be understood to be about other former employees in the Equity

- 9 -

Division and the statements can be reasonably construed in a way that does not assert illegal or unethical behavior by former employees.

¶ 32  Both of Allstate's arguments are rooted in the innocent construction rule, which our supreme court clarified in *Chapski v. Copley Press*, 92 Ill. 2d 344 (1982). *Chapski* involved defamation claims brought by an attorney against various media outlets based on articles and editorials depicting litigation and disciplinary proceedings in which the plaintiff was involved. *Id.* at 345-47. The circuit court dismissed the plaintiff's claims, the appellate court affirmed, and both courts applied the "innocent construction" rule to conclude "that the language itself could be innocently construed or that the articles as a whole could be construed as referring to the legal system rather than the plaintiff." *Id.* at 347. The supreme court reversed, finding that the lower courts had not applied the proper interpretation of the innocent construction rule. The court examined the confusing, conflicting, and sometimes strained way the rule had been applied (*id.* at 347-51), and clarified that

> "a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se.* This preliminary determination is properly a question of law to be resolved by the court in the first instance; whether the publication was in fact understood to be defamatory or to refer to the plaintiff is a question for the jury should the initial determination be resolved in favor of the plaintiff." *Id.* at 352.

¶ 33  The notion that a statement is not actionable *per se* if the statement can reasonably be interpreted as referring to someone other than the plaintiff embodies a rule that this court has applied when an allegedly defamatory statement does not name the plaintiff. See, *e.g.*, *Barry Harlem Corp. v. Kraff*, 273 Ill. App. 3d 388, 390-91 (1995) ("A statement which does not mention the plaintiff by name cannot be injurious to him or her on its face. Extrinsic facts and circumstances must be pled to establish that the publication is defamatory to him."); *Homerin v. Mid-Illinois Newspapers*, 245 Ill. App. 3d 402, 405 (1993) (affirming dismissal of defamation *per se* claim where a published political cartoon "does not identify plaintiff by name. Even if his likeness could be reasonably interpreted as being depicted in the cartoon, his complaint is fatally flawed for failing to allege that the readers of the publication reasonably understood the cartoon to refer to him."); *Schaffer*, 196 Ill. App. 3d at 732 (rejecting a defamation *per se* claim where the allegedly defamatory statement "does not mention [the plaintiff] by name, cannot be injurious to him on its face [citation], and is not defamatory *per se* as to him [citation]. Extrinsic facts and circumstances must be pleaded to establish that the publication was defamatory as to him (colloquium),[2] and special damages must be alleged with particularity."); *Moore v. Streit*, 181 Ill. App. 3d 587, 597-98 (1989) ("One of the

---

[2]"Colloquium" is one of many terms that have fallen out of use in modern judicial opinions discussing defamation pleadings. Our supreme court explained in *People v. Spielman*, 318 Ill. 482, 488 (1925), that, "Where the alleged defamatory words are ambiguous or equivocal and require explanation by reference to some outside or extrinsic matter to show that they are actionable, it must be expressly stated that such matter existed and that the defamation related thereto. The allegation thus required is called the inducement or statement of extrinsic matter. The colloquium is an averment which connects the defamatory words with the complaining party and with the extrinsic matters, if any, set forth by way of inducement. The office of the innuendo is to aver the meaning of the language published."

requirements for matter to be considered defamatory *per se* is that it must be injurious on its face. [Citation.] A statement that does not name an individual is not injurious to that person on its face."); *Voris v. Street & Smith Publications*, 330 Ill. App. 409, 413 (1947) ("It is not enough to constitute libel that plaintiff knew that he was the subject of the article, or that defendants knew of whom they were writing. It should appear upon the face of the complaint that persons other than these must have reasonably understood that the article was written of and concerning the plaintiff, and that the so-called libelous expression related to him."). In *Bryson*, 174 Ill. 2d at 96-97, the supreme court agreed that, in general, "where a libelous article *does not name the plaintiff*, it should appear on the face of the complaint that persons other than the plaintiff and the defendant must have reasonably understood that the article was about the plaintiff and that the allegedly libelous expression related to her." (Emphasis in original.)

¶ 34        Here, it is undisputed that the Form 10-K and Greffin memo do not specifically name any of the plaintiffs. The Form 10-K stated:

> "In 2009, we became aware of allegations that *some employees responsible for trading equity securities in certain portfolios of two [Allstate] defined benefit pension plans and certain portfolios of [Allstate] and an [Allstate] subsidiary* may have timed the execution of certain trades in order to enhance *their* individual performance under incentive compensation plans, without regard to whether such timing adversely impacted the actual investment performance of the portfolios." (Emphases added.)

Likewise, the Greffin memo stated that Allstate's Form 10-K "disclosed details around allegations regarding *trading practices within our equity portfolios* that came to light in the past year." (Emphasis added.) Plaintiffs' names do not appear anywhere in the Form 10-K or the Greffin memo. The statements—read in context and given their natural and obvious meaning—on their face, are not injurious to plaintiffs and are not defamatory *per se* as to them. See *Schaffer*, 196 Ill. App. 3d at 732; *Barry Harlem*, 273 Ill. App. 3d at 390-91. The statements, on their face, can be reasonably construed as referring to individuals other than plaintiffs, given that the statements refer to a group of people without specifying any particular position among the equity traders. We fail to see how, from the face of the statements, a reader could reasonably infer that the statements were about plaintiffs.

¶ 35        Plaintiffs argue, however, that *Bryson* saves their defamation *per se* claim because *Bryson* permits a plaintiff to plead extrinsic facts in their complaint "that persons other than the plaintiff and the defendant must have reasonably understood that the article was about the plaintiff and that the allegedly libelous expression related to her." *Bryson*, 174 Ill. 2d at 96-97. We disagree because *Bryson* is distinguishable and inapposite.

¶ 36        In *Bryson*, the defendants wrote and published a purportedly fictional short story titled "Bryson" that "recount[ed] a conflict between the unidentified speaker and her high school classmate, 'Bryson.' " *Id.* at 84. In the story, the unidentified speaker referred to "Bryson" as a " 'slut.' " *Id.* at 83. Plaintiff, whose last name was Bryson, sued the defendants for defamation *per se*. The supreme court concluded that the term "slut" was actionable *per se* (*id.* at 90), and then turned to the defendants' argument that the innocent construction rule applied. Defendants argued that "where an allegedly defamatory statement does not mention the plaintiff by name, the plaintiff must plead extrinsic facts to demonstrate that third persons believed that the libelous statement referred to the plaintiff." *Id.* at 96. The court agreed with

> "the general proposition that, where a libelous article *does not name the plaintiff*, it should appear on the face of the complaint that persons other than the plaintiff and the

defendant must have reasonably understood that the article was about the plaintiff and that the allegedly libelous expression related to her." (Emphasis in original.) *Id.* at 96-97.

But the court observed that the general principle did not apply to the case before it because the article *did* use the plaintiff's name, and the name " 'Bryson' is not so common that we must find, as a matter of law, that no reasonable person would believe that the article was about the plaintiff." *Id.* at 97. Therefore, the case was distinguishable from cases such as *Voris*, *Moore*, *Homerin*, and *Barry Harlem*—which we discussed above (*supra* ¶ 33)—in which the plaintiff was not named at all. *Bryson*, 174 Ill. 2d at 97. The *Bryson* court therefore rejected "the defendants' claim that the story must be innocently construed as referring to someone other than the plaintiff." *Id.* The story allegedly contained numerous similarities between the plaintiff and the physical attributes, locations, and events attributed to the character Bryson, such that the plaintiff "should be allowed the opportunity to prove that, despite the fictional label, the character 'Bryson' bears such a close resemblance to the plaintiff that reasonable persons would understand that the character was actually intended to portray the plaintiff." *Id.* at 98.

¶ 37     *Bryson* is inapposite because it involved a defamation claim in which the plaintiff was named. Furthermore, it is distinguishable because the plaintiff's last name was used in the story and there was evidence as to similarities between the plaintiff and the character in the story. In other words, the plaintiff adequately alleged, for the purposes of surviving a section 2-615 motion to dismiss, that there was enough on the face of the story for a reader to reasonably understand that the article was about her. Here, the allegedly defamatory statements, on their face, do not refer to plaintiffs in any manner, and only though extrinsic evidence could plaintiffs establish that they were the individuals being discussed in connection with the alleged timed trading. Applying the rule in *Chapski*, 92 Ill. 2d at 352, that a statement is not actionable *per se* if "the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff,"—which our supreme court endorsed again in *Solaia*, 221 Ill. 2d at 580—we find that plaintiffs' complaint does not and cannot state a claim for defamation *per se*. The circuit court's judgment dismissing count I of plaintiffs' complaint is affirmed.

¶ 38                                              B. Collateral Estoppel

¶ 39     We next consider plaintiffs' argument that the circuit court erred by applying collateral estoppel to dismiss the defamation *per quod* and false light claims in counts II and III, respectively. Our supreme court has explained that the doctrine

> "applies when a party, or someone in privity with a party, participates in two separate and consecutive cases arising on different causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction. The adjudication of the fact or question in the first cause will, if properly presented, be conclusive of the same question in the later suit, but the judgment in the first suit operates as an estoppel only as to the point or question actually litigated and determined and not as to other matters which *might* have been litigated and determined." (Emphasis in original.) *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389-90 (2001) (citing *Housing Authority for La Salle County v. Young Men's Christian Ass'n of Ottawa*, 101 Ill. 2d 246, 252 (1984)).

¶ 40    For collateral estoppel to apply, "a decision on the issue must have been necessary for the judgment in the first litigation, and the person to be bound must have actually litigated the issue in the first suit." *Talarico v. Dunlap*, 177 Ill. 2d 185, 191-92 (1997). Because collateral estoppel is an equitable doctrine, merely satisfying the elements of the doctrine is not enough; "collateral estoppel must not be applied to preclude parties from presenting their claims or defenses unless it is clear that no unfairness results to the party being estopped." *Id.*

¶ 41    Here, whether plaintiffs are collaterally estopped from asserting their claims in counts II and III depends on whether it was necessary for the Seventh Circuit to determine—as part of its standing analysis in connection with plaintiffs' FCRA claim—that plaintiffs had not established special damages to support their claims for defamation *per quod* and false light.

¶ 42    Plaintiffs argue the circuit court failed to distinguish between plaintiffs' failure to allege a concrete injury-in-fact to support their FCRA claim and their allegations of an injury and damages resulting from Allstate's defamatory statements in support of their defamation *per quod* claim. Plaintiffs argue that collateral estoppel only applies to bar relitigation of the identical issue decided in prior litigation and that when a federal court dismisses an action on jurisdictional grounds, collateral estoppel only applies to issues that were necessary for the federal court's decision on the issue of jurisdiction. They argue that the Seventh Circuit's finding that plaintiffs "failed to identify any prospective employer that refused to hire them based on the 10-K or the Greffin memo" was a "holdover" from *Rivera I* and was not necessary to that court's finding that plaintiffs' lacked standing to pursue their FCRA claim; plaintiffs argued in the federal litigation that Allstate's failure to provide a summary of Steptoe & Johnson's internal investigation hampered their ability to defend themselves, but the Seventh Circuit rejected that argument and determined that any failure to provide a summary was a procedural violation "unaccompanied by any concrete and particularized harm." See *Rivera II*, 913 F.3d at 617. In other words, plaintiffs argue that their FCRA and defamation claims asserted different injuries and that a finding that they lacked an adequate injury to support their FCRA claim—a hampered defense posture—did not have any bearing on the injury alleged in connection with their defamation claim—that prospective employers refused to hire plaintiffs because of Allstate's defamatory statements. They contend that because the Seventh Circuit lacked jurisdiction to decide anything more than the standing issue, it did not issue a decision on the merits of the defamation claim that could be given preclusive effect in this litigation.

¶ 43    In response, Allstate argues that collateral estoppel applies. Allstate contends that plaintiffs specifically argued to the Seventh Circuit that Allstate's failure to provide a summary of the investigation was a concrete injury-in-fact because it hampered their ability to defend themselves to prospective employers. Specifically, plaintiffs' appellate brief in the court of appeals asserted, "Plaintiffs testified that, if they had the summaries, *they could defend themselves to potential employers who knew of Allstate's publication*. [Citation.] Without a summary, Plaintiffs were hampered from defending themselves before Allstate or potential employers. This constitutes actual, concrete, and particularized harm." (Emphasis added.) Allstate asserts that the only injury-in-fact that plaintiffs sought to prove to support their FCRA claim was that plaintiffs could not defend themselves to prospective employers, but—as the Seventh Circuit concluded in finding that plaintiffs lacked standing on their FCRA claim— plaintiffs did not present any evidence that a prospective employer refused to hire them. In Allstate's view, this finding extends to the defamation claim because if plaintiffs had proven special damages for their defamation claim, "they would have had standing under FCRA."

¶ 44    We agree with plaintiffs that collateral estoppel does not apply here to bar their claims for defamation *per quod* and false light. Plaintiffs' FCRA claim was directed at Allstate's alleged failure to provide a summary of Steptoe & Johnson's report and was not based on the allegedly defamatory statements made in the Form 10-K or Greffin memo. Plaintiffs struggled before the Seventh Circuit to establish not only that they had a cognizable claim under FCRA but also that Allstate's failure to provide a summary of the investigation was anything more than a procedural violation of FCRA, and they were ultimately unable to point to some actual injury that flowed from Allstate's failure to provide the summary. The Seventh Circuit rejected any notion that the required summary provides a "substantive 'defense' interest." *Id.* In our view, that was all that was necessary for the Seventh Circuit to decide plaintiffs' FCRA claim; plaintiffs lacked standing to pursue their FCRA claim as a matter of law, given the statutory framework and the allegations in the complaint. The Seventh Circuit's observation that plaintiffs "failed to identify any prospective employer that refused to hire them based on the [Form] 10-K or the Greffin memo" (*id.*) was not a necessary finding related to its decision that plaintiffs lacked standing to pursue their FCRA claim because the standing question turned on a question of law, not fact.

¶ 45    Allstate contends that if plaintiffs established that some prospective employer refused to hire plaintiffs because of the allegedly defamatory statements in the Form 10-K or Greffin memo, then plaintiffs would have established standing to pursue their FCRA claim. Allstate asserts that "the issue of injury for both the FCRA and *per quod* claims is identical—whether prospective employers learned of the reason for [p]laintiffs' termination from the [Form] 10-K or Greffin Memo and therefore refused to hire them." But how can that be true? The FCRA claim was premised on Allstate's failure to provide *plaintiffs* with a summary of the investigation after they were terminated. What does it matter, for the purposes of the FCRA claim, what a *prospective employer learned*? There is nothing "identical" about the FCRA and defamation *per quod* claims; even if plaintiffs stated a valid FCRA claim, they would have had to submit proof that Allstate did not do what it was required to do: provide a summary of the investigation after plaintiffs were fired. That is a far cry from what would be required to prove defamation *per quod*: that Allstate made a statement that was demonstrably defamatory, that the unprivileged statement was made to a third party, and that plaintiffs suffered special damages. The proof required to establish these distinct claims have no overlap, and thus it was not necessary for the Seventh Circuit to decide whether there was any evidence of special damages to support the jury's verdict in plaintiffs' favor on their defamation *per quod* claim.

¶ 46    In sum, the circuit court erred in finding that collateral estoppel applied to bar counts II and III of plaintiffs' complaint.

¶ 47              C. Sufficiency of Plaintiffs' Defamation *Per Quod* and False Light Claims

¶ 48    Allstate alternatively argues, as it did in the circuit court, that counts II and III fail to state claims for defamation *per quod* and false light and were subject to dismissal under section 2-615 and that we should affirm the circuit court's judgment dismissing counts II and III. Allstate contends that plaintiffs were required to plead special damages with particularity to support their defamation *per quod* and false light claims and that they did not—and cannot—do so. We agree.

¶ 49    As discussed above, a defamation *per quod* claim requires plaintiffs to allege that they suffered actual damages of a pecuniary nature—special damages—because of a defamatory

- 14 -

statement. "[S]pecial damages must be alleged with particularity, and general allegations as to damages are insufficient." *Bruck v. Cincotta*, 56 Ill. App. 3d 260, 266 (1977); see also *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 416 (1996) ("A *per quod* action requires *** allegations of specific facts establishing the plaintiff's special damages.").

¶ 50    Here, plaintiffs' sole allegation of special damages in counts II and III is that Allstate's allegedly defamatory statements "have caused [p]laintiffs damages in their business and profession and made it impossible for them to achieve comparable employment in a highly competitive field." Our decision in *Kurczaba v. Pollock*, 318 Ill. App. 3d 686, is instructive, and the following passages are particularly useful:

> "Illinois courts have consistently stated that general allegations such as damage to one's health or reputation, economic loss, and emotional distress are insufficient to state a cause of action for defamation *per quod. Becker v. Zellner*, 292 Ill. App. 3d 116, 127 (1997)]; [*Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 870 (1995)]; [*Taradash v. Adelet/Scott-Fetzer Co.*, 260 Ill. App. 3d 313, 318 (1993)]; [*Schaffer*, 196 Ill. App. 3d at 733]. While our independent research has revealed no specific definition or details of precisely what special damages are, one court found allegations to be sufficient. *Becker*, 292 Ill. App. 3d 116. In *Becker*, allegations that the defamatory material 'caused or contributed to Plaintiffs losing prospective employment opportunities with respect to the preparation of a civil complaint to be filed in federal court on behalf of [a client]' were found to be sufficient because the allegations alleged that a third party had actually stopped doing business with the plaintiffs. *Becker*, 292 Ill. App. 3d at 127.

> On the other hand, most courts have found allegations to be insufficient to allege special damages. See [*Anderson*, 172 Ill. 2d at 416-17] (allegations that the plaintiff 'ha[d] been damaged monetarily by losing gainful employment and wages' and that she 'ha[d] suffered great mental pain and anguish and incurred great expense for the treatment thereof'); *Quinn*, 276 Ill. App. 3d at 870 (allegations that a franchiser refused to grant the plaintiff a franchise); [*Barry Harlem*, 273 Ill. App. 3d at 395] (allegations that the plaintiff 'ha[d] lost patients who would have otherwise presented themselves for treatment'); *Taradash*, 260 Ill. App. 3d at 318 (allegations that former customers refused to deal with the plaintiff, that he was unable to sell his product, and that he lost commissions and income); *Schaffer*, 196 Ill. App. 3d at 733 (allegations that the plaintiff had been disgraced and injured in his professional reputation); [*Heerey v. Berke*, 188 Ill. App. 3d 527, 532 (1989)] (allegations that the plaintiff suffered from 'distress of mind, mental anguish, acute nervousness, bodily pain and that her reputation for honesty and integrity, business opportunities, as well as her standing in her professions ha[d] been impaired'); [*Harris Trust & Savings Bank v. Phillips*, 154 Ill. App. 3d 574, 585-86 (1987)] (allegations that the plaintiff was exposed to 'public hatred, contempt, and ridicule and tended to deprive [the plaintiff] of public confidence and injured it in its business and reputation'); [*von Solbrig Memorial Hospital v. Licata*, 15 Ill. App. 3d 1025, 1031 (1973)] (allegations that the plaintiff suffered ill health, emotional distress and damage to reputation and medical practice)." *Id.* at 694-95.

¶ 51    Based on the foregoing, we find that plaintiffs' allegations of special damages are general in nature. They merely allege that they were damaged and that it is impossible for them to find work in their professional field. They do not allege any specific facts to support their general

claim that they were damaged. They do not allege any specific facts to show that a prospective employer refused to hire them because of the alleged defamatory statements. They do not even allege any specific facts to show that they applied or interviewed for any specific positions that they did not get.

¶ 52    Plaintiffs rely on *Leyshon v. Diehl Controls North America, Inc.*, 407 Ill. App. 3d 1 (2010), *Imperial Apparel Ltd. v. Cosmo's Designer Direct, Inc.*, 367 Ill. App. 3d 48 (2006), *rev'd on other grounds*, 227 Ill. 2d 381 (2008), and *Tunca v. Painter*, 2012 IL App (1st) 093384, to support their argument that they have adequately pleaded special damages. Those cases do not compel a different result here.

¶ 53    First, plaintiffs' reliance on *Leyshon* is misplaced. Not only was *Leyshon* a defamation *per se* case and had nothing to do with the sufficiency of pleading special damages to support a defamation *per quod* claim, but that case reached this court following a jury's verdict in the plaintiff's favor, therefore implicating a deferential standard of review. There, the plaintiff was fired from his job for cause. *Leyshon*, 407 Ill. App. 3d at 3. As we set forth in our opinion,

> "[w]hen the plaintiff then asked what he was terminated for, [the defendant] Dr. Weigand responded, ' "for cause." ' When the plaintiff expressed incredulity, Dr. Weigand stated, ' "You are terminated for cause under the terms of your employment agreement." ' The plaintiff responded, ' "You are telling me that you are firing me for gross insubordination, for gross misconduct, for gross negligence and willful violation of the law?" ' Dr. Weigand responded, ' "Yes" ' and would not elaborate further." *Id.*

Plaintiff filed a defamation *per se* claim, and the case proceeded to trial. At trial, the plaintiff testified that he was humiliated by having to tell his family that he was fired for cause and when he attended an employee dinner, " 'nobody could look [him] in the eye.' " *Id.* at 3. The allegedly defamatory statements "impacted his standing in the business community and his ability to find work," and people in the industry stopped communicating with him. *Id.* at 4. He presented evidence from an executive search management consultant that the for-cause termination meant that he would not be considered for comparable positions in the industry. *Id.* The jury returned a verdict in favor of the plaintiff and awarded compensatory and punitive damages, and defendants appealed. *Id.* at 5. We affirmed. On the issue of compensatory damages, we rejected the defendants' argument that there was insufficient evidence to support the $2 million compensatory judgment, observing that the plaintiff had presented uncontroverted evidence of damages—namely, that the defamatory statement had spread to the industry in which the plaintiff sought work and that he was unable to obtain comparable employment. *Id.* at 12-13.

¶ 54    We fail to see how *Leyshon* helps plaintiffs here. There, the jury's compensatory damages award was upheld both because the case involved presumed damages—since the plaintiff pursued a defamation *per se* claim—and we found the damages award was not unreasonable considering the evidence presented. Here, plaintiffs did little more than allege general damages to support their defamation *per quod* and false light claims.

¶ 55    Next, we find *Imperial Apparel* distinguishable. That case involved defamation *per se* and *per quod* claims, along with a false light claim, brought by Imperial Apparel, Ltd. (Imperial), and its individual owners for statements the defendant made in a newspaper advertisement. *Imperial Apparel*, 367 Ill. App. 3d at 51. The circuit court dismissed the plaintiffs' complaint in its entirety. *Id.* In relevant part, we reversed the circuit court's dismissal of Imperial's defamation *per quod* claim because Imperial alleged that the defendant's ad proximately

caused Imperial's sales to decrease. *Id.* at 58-59. We rejected the defendant's argument that Imperial was required to specifically plead which potential customers were deterred from purchasing Imperial's merchandise, reasoning that there was a "wide dissemination of the disparaging materials to persons unknown and the plaintiff is in the business of offering goods for sale to the general public," making it impossible for Imperial to specifically allege the customers who chose not to purchase Imperial's merchandise. *Id.* at 59. We concluded that Imperial was "only obligated to be as specific as it is reasonable to require." *Id.* Our supreme court subsequently reversed the portion of our opinion reinstating Imperial's *per quod* claim (among others) on the grounds that the defendant's advertisement was constitutionally protected speech and not actionable, and therefore the circuit court's dismissal of the entire complaint was affirmed. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381 (2008).

¶ 56    Our opinion in *Imperial Apparel* is distinguishable because there we concluded that Imperial had in fact alleged special damages with sufficient particularity. Notably, Imperial alleged a quantifiable pecuniary injury resulting from the allegedly defamatory statement. Plaintiffs here, however, did no such thing, but instead alleged general damages to their reputation.

¶ 57    Finally, in *Tunca*, the plaintiff, a surgeon, asserted in relevant part a defamation *per quod* claim against the defendant, the chairman of a surgery quality review committee, after the defendant made statements to other doctors and medical professionals that the plaintiff negligently and inadvertently cut a patient's artery during a surgical procedure. *Tunca*, 2012 IL App (1st) 093384, ¶¶ 3-4. The plaintiff's third amended complaint alleged that, because of the defendant's statements, other doctors did not refer any new patients to the plaintiffs and that, from 2006 to 2007, his business income dropped by $861,506. *Id.* ¶ 15. The circuit court dismissed the *per quod* claim, but we reversed. On the issue of special damages, we found that the plaintiff had adequately pleaded special damages by pleading that specific people refused to do business with him because of the allegedly defamatory statements, resulting in a specific pecuniary injury. *Id.* ¶ 62.

¶ 58    Once again, plaintiffs' allegations here are not like those in *Tunca*, where the plaintiff not only alleged that his reputation was injured but offered specific factual allegations to show that he suffered a pecuniary injury because of the allegedly defamatory statements. It is simply not enough for a *per quod* plaintiff to allege injury by a defendant's statements; there must be an allegation of a pecuniary injury with some reasonable degree of specificity. Plaintiffs' allegations here do not meet that standard. In their reply brief to this court, plaintiffs argue, without citation to any materials in the record, that at the federal trial,

> "[p]laintiffs testified that many of the people in the community would no longer return their calls, and they were advised by a placement professional in their industry that they would be unable to obtain employment in North America following publication of the10-K. Consistent with Allstate's own practice, none of these prospective employers provide applicants with explanations as to why they are not hired. Plaintiffs will provide opinion testimony that it is standard practice in hiring, [*sic*] for employers to not provide explanations to applicants as to why they were not hired, and virtually all of the employers to which Plaintiffs applied had written policies preventing Plaintiffs from learning the reason they were not hired. In effect, Allstate seeks to dismiss

[p]laintiffs' claims for not having information which Allstate itself would never give to an applicant."

¶ 59    These additional, unpleaded factual claims are not inferences that can be drawn from the factual allegations in the complaint. Plaintiffs have failed to allege specific facts with particularly to support their allegation of special damages in their complaint, and their defamation *per quod* and false light claims in counts II and III were subject to dismissal under section 2-615 of the Code.

¶ 60    We recognize that affirming the circuit court's judgment on alternative grounds gives rise to a question as to whether plaintiffs should be given an opportunity to replead their *per quod* claim. Given the length of time this case has been pending and the prominence of whether special damages has been pleaded during this period, the answer is "no." The parties litigated the *per quod* claim in federal court for nearly eight years, and plaintiffs have always known the elements of a *per quod* claim—specifically, the requirement for pleading special damages. As the Seventh Circuit noted, the defamation *per quod* claim "predominated" over the FCRA claim in the district court and in the court of appeals (*Rivera II*, 913 F.3d at 612) and was a particular focus of *Rivera I*, 907 F.3d 1031. Plaintiffs' *per quod* claim was effectively revived by the jurisdictional dismissal of that claim in federal court.

¶ 61    In the circuit court below, Allstate moved to dismiss on collateral estoppel grounds or, alternatively, for failure to adequately plead special damages. Plaintiffs responded to both arguments, and, relative to Allstate's argument that there was a failure to plead special damages, plaintiffs' response forcefully argued that they adequately pleaded special damages. Notably, plaintiffs' response in the circuit court did not request leave to replead if the circuit court granted Allstate's section 2-615 motion. Similarly, in this court, Allstate's appellate brief argued that the circuit court's dismissal judgment was proper under both section 2-619 (collateral estoppel) and section 2-615 (failure to allege special damages). Plaintiffs' reply brief again repeated the argument made in the circuit court that they adequately pleaded a *per quod* claim, including allegations of special damages. At no point during the circuit court proceedings or the briefing of this appeal did plaintiffs argue that they should have an opportunity to replead their *per quod* claim, resulting in forfeiture of any such argument. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 62    Nonetheless, at oral argument, plaintiffs asserted that if we found that collateral estoppel does not bar their *per quod* claim but affirmed the circuit court's dismissal judgment because the complaint does not adequately allege special damages, we should remand to the circuit court to allow plaintiffs to replead their *per quod* claim. Plaintiffs raised this issue for the first time at oral argument during their rebuttal, well after the issue had been forfeited. While forfeiture is a limitation on the parties and not on the court, we will not excuse plaintiffs' forfeiture here. Not only would excusing plaintiffs' forfeiture prejudice Allstate, which never had an opportunity to brief or present any argument on that issue, but more than eight years of litigation has elapsed and the question of pleading special damages has been a persistent issue confronting plaintiffs. Under these unusual circumstances, we find that plaintiffs have had more than enough time to craft an adequate defamation *per quod* pleading and that a remand to allow repleading would not be an appropriate exercise of our judicial discretion. The circuit court's judgment dismissing counts II and III with prejudice is affirmed.

¶ 63                                III. CONCLUSION

¶ 64          For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 65          Affirmed.